Thank you, Your Honor. May it please the Court, I'm John Minster. I represent the estate of Max Martinez and his daughter, Carissa Martinez. I have the pleasure of introducing my co-counsel, Mr. Richard Gemson, who is at counsel table. Your Honor, this is an appeal from a district court order granting the defendant Monaco's motion for partial summary judgment. The standard of review is de novo, and we contend that under the facts that we produced, Mr. Monaco is not entitled to qualify immunity under federal law for the killing of Max Martinez. First of all, the law is clearly established. Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing, and his escape will result in a serious injury. In the Ruby Ridge case, Harris v. Roderick, this court emphasized that the police cannot kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they're armed. Now, the district court felt that, under the facts, Mr. Monaco … Secondly, there's testimony in the record from the civilian witnesses, and as you know, there were a number of civilian witnesses who watched this, who testified that he raised both of his hands in the air in an angel wings position. This is a very serious type of movement, like this. With or without the gun? With the gun in his hand. But the important thing is, one of the witnesses, and that would be the inquest testimony of Edda Hill on ER 93 through 95, crucial testimony in terms of establishing disputed facts in this case. She says that he raised both hands at the same time, and he was not looking at the black officer. Now, the reason that's significant is the black officer is Officer Boutte, who's the guy who they are claiming he was pointing the gun at. But her testimony is that Mr. Martinez was not even looking at that officer. Where was the gun pointing? Well, the facts are … I guess I'll put it this way. Where was that officer in relation to the decedent? I think he's off to his right. By which hand did the decedent have the gun? I think he … Which one did he suffer the injury to where the bullet went up indicating a horizontal line of the arm to the ground? I think it was his right hand, but I … Okay. I apologize for not being able to answer that quickly. I'm holding that answer against you. That's just your best recollection at the moment. That's okay. Not to be correct. You know, let's assume that they're out to the side. It's not pointing … You know, because obviously you get all inferences in favor of your side in this particular situation. It appears that it was also … Some of the other undisputed facts are that the decedent had earlier … I mean, there had been earlier displays of the gun, obviously, and that he … Sure. And all of that. So this had gone on for a period of time. And also the comment, there's going to be some shooting here. So let's just assume that they're out to the side. They're not pointing at anyone. What … You know, does it have to … You have to allow … Is it reasonable to allow that they move it and you give someone the first shot? I mean, I think that's … Well, I think that … I mean, can't a gun be pretty threatening out here at the side? It only takes that much to, you know, to put it over. Well, I think that's the … I think that's a decision that the jury has to make. Because under our facts, a jury could conclude that Mr. Martinez was not an immediate threat.  He was drunk, wasn't he? I think he was. Well, he had to be. You know, he had, what, .25? Yeah, he was drunk. He was drunk. And while I'm at it, I think that I should point out that this was not like the Ruby Ridge situation where the people are wanted for shooting at a U.S. Marshal. These are two misdemeanor hit-and-runs. I don't know why you even brought Ruby Ridge up. You know, that's so far fetched from this. The reason I cited the case … You don't have to tell me, but it's okay. The reason I brought up the case is because the … you know, it relates to the standards for the use of deadly force. And here, this is a guy … what this starts off as is a traffic stop on a misdemeanor hit-and-run. They tell him to get out of the car. He gets out of the car. They take his girlfriend into custody. He's saying, let her go. They say, if you get on your knees, we'll let her go. He gets on his knees. They don't let her go. He stands up again. They're telling him to raise his hands. A jury could find that he did not pose an immediate threat to the officer. See, the theory is that he was … the police side of the story is that he was pointing his gun at Officer Boutte, who was not the guy who killed him. But he was … the jury could find that he wasn't even looking at Officer Boutte, that he was complying with the command to raise his arms, that he's doing it in … he's raising both hands at the same time, which is extremely significant. In other words, if he's got one arm on his side and he's going like this, you know, which are not our facts, you know, that's more sinister. But if you're raising both your arms in an angel wings fashion like this, and see, to the civilian witnesses, he was shot, or they thought that he had fired a shot when his hands were up here like this. So according to the civilian witnesses, he goes like this, and then they hear the shots fired. What's better if he didn't have a gun in his hand, though? Well, that's true in so many situations. It's … obviously, we wouldn't be here in a wrongful death case if he had just put his gun down on the pavement. But that doesn't give the police the right to execute him. Under our facts, the jurors could think that he was giving himself up, and there's a third witness. It's either Ms. Hill or Mr. Shampo who says, oh, you know, good, he's finally … it appeared to that witness, Mr. Shampo, this is footnote 16 in my factual recitation, who thinks, oh, good, he's finally giving himself up. You know, I didn't realize … somebody says I didn't realize he had to put the gun down before he gives himself up. But anyway, to that witness, it appeared that he was giving himself up. So if those were … the jury could find that that's what he reasonably appeared to be doing. He wasn't looking at the guy the police claim he was pointing the gun at, and that it was unreasonable under the circumstances to open fire. It's also significant, and may … could be significant to a jury, that the officers … the officers are supposed to be separated after an incident like this. But prior to … but Officer Monaco, who is the defendant in this case, after Mr. Martinez is handcuffed, before the investigation per se has begun, before the supervisors have intervened at the scene, he turns to Officer Boutte, and he says, uh, he raised that gun at you. And Boutte replies, yes, he did. He raised that gun at me. He raised that gun at me. Now, why would they have to have that kind of conversation at that point? You know, if I get to try this case to a jury, you know, those guys are going to be questioned about that. Why do they have to tell each other what their proper justification for the shooting was going to be under those circumstances? This is … Well, that's not too unusual, isn't it? If you shot a guy to say, the guy raised the gun at me, you know, I don't see anything unusual about that. I don't think they're trying to get their story straight or trying to get the other guy to say it. That's one, you know, you could argue that to the jury. But if you shoot somebody and somebody looks at you and says, well, he raised the gun at me, you know, it's almost inquiring, why'd you shoot him? You know, that's one inference that you could draw. But, you know, if we get into trial, you know, I've done wrongful death cases before, and the protocol is the officers are not supposed to talk to each other after the shooting. They're supposed to be separated. I think in the record here, I think somewhere in my excerpt of record, I include something where Monaco says, in the inquest testimony, I believe, he said he went directly to his police car and sat there until he … Well, but when you're talking about the protocol, that's essentially when the scene's been secured. I mean, you still have Mr. Martinez waiting for medical care. You still have him … Initially, my understanding is they initially handcuff him, and then they unhandcuff him because to try to give him to put, you know, because he's having trouble breathing, that there's evidence to that. But, you know, I guess focusing back on before the shooting occurs, if, I mean, doesn't it really kind of boil down to, obviously, there are statements, you know, there are statements that come from the officers, but giving you all the inferences, taking all the statements of your witnesses as being true, as opposed to … And I think that they're more favorable for your case than, obviously, for the officer's case. If you … Don't we just have to look at those and decide whether an officer would have been justified shooting under those circumstances? You know, assuming that the arm, you know, has a gun in his hand, but the arms are up to his side or either over his head and not pointing directly at someone. But, obviously, you can't excise that from the fact that there has been some … There's some undisputed facts that occurred before, in terms of the gun coming out previously, you know, his not surrendering, saying there's going to be some shooting. But don't we just assume your best witnesses as being true and then decide whether that's … That's right. Taken in the light most favorable to the party asserting the injury. Do the facts alleged show the officer's conduct violated the constitutional right? Under our facts, he's giving up. He's raising his arms in an angel wings fashion. He puts his hand up above his head, according to the civilian witnesses. They think he shot when he's up like this, when he's given up. And that's when they hear the shots get fired. What they think is it. It's what … What it appeared to them. How we objectively interpret that. Okay. What they say is his hands are above his head. They hear the shots. So, under those … When you do that, you kind of do a touchdown Jesus with your hands. Like this. But the angel fashion, it seems to me, is more parallel like this. But I don't know what the witnesses are saying when they say angel … Most of the angels I've seen are kind of like this. At Notre Dame, at the end of the building. Jesus is like this. Well, all the angel pictures I've seen, the wings go way up here. And I, you know, I didn't make … I guess I didn't make a detailed record when I was questioning that witness. About the movement. But I guess I … Well, I know what it was. She was talking about the angel wings in the snow. And, you know, when you're a kid and you do angel wings, you do it like this. See? You know, you're lying in the snow. I grew up in the Midwest. I think you got a pretty good answer and you didn't want to follow it up. But that's up to you. Well, it's not that. I mean, I just didn't think of, you know, getting to that at that point. You know, I wish that you'd been there to ask the question. In any event, the qualified immunity standard is a very difficult one for the defense to surmount. And I think we should have been allowed to proceed to a jury as to the first shot. I'll talk very briefly about the remaining issues. There's testimony in the record that after the first shot, Mr. Martinez collapsed and rolled under the truck. That his back was to the officers. And the second shot, when the second shot gets fired, it hits him in the buttocks. So the officers are claiming, at least one of the officers, Officer Monaco, is claiming that he thought that Mr. Martinez was trying to get up on his elbow or something under the truck and somehow miraculously get off another shot, so he blasts him again. The jury could find that, you know, the guy was lying on his side with his back to the officers and he got blasted in the buttocks on the second shot. So I think we're entitled to submit that case to the jury, too. Submit that to the jury. Finally, if you reverse on the quali... Which shot was fatal, I just wondered. You know, the defense theory is that the first shot was fatal, that it hit him in the chest, and the fatal shot was, it hit his aorta. But there's some, there was autopsy evidence at the... Sure. Was that, is that undisputed or was there anything disputed to what the doctor said? The autopsy evidence... You know, in my brief, I didn't have a chance to look that up when I got home last night, but in my brief, I indicate that the medical examiner did not know which of the shots came first. Let me see if I can find that here. Well, in my brief on page 15, and this is the factual section, page 35, I indicate he received two shotgun blasts. The medical examiner could not determine whether the first or second shotgun blast was fatal. And then I cite the autopsy report that's in Mr. Christie's declaration. Oh, I might add, something I'd like to apologize about before I sit down, and that is I also included the autopsy report and Dr. Harroff's testimony in my excerpt of record at pages 23A through R, but they didn't make it into the table of contents. And so that's a typo that I'd like to apologize for. Well, did any of the witnesses testify as to Mr. Martinez's state of intoxication? I think one of the officers described him as being dazed and confused. And let me look that up here. Mr. Martinez seemed dazed and intoxicated. That's on page 7, factual paragraph 5. And he says, the police tell him to show his hands and put them above his head. Mr. Martinez says, what's all this about? Why are you doing this? What's going on? And I don't think he's described as staggering drunk, but he's described as kind of being out of it. But on the other hand, there is the testimony in the record about his asking him to let his girlfriend go, and they say, get down on your knees. So then he does get down on his knees, and then they don't let him go. He had a high... Well, did he have a history of alcoholism? Do you know? Is that in the record? I don't think that's in the record. You pointed out the blood test result, and that's really high. So in any event, I see that my time is rapidly... People can move around pretty good, you know, with that much alcohol in them. You know, we don't have... we didn't get that far. Basically, what happened is this case was filed. There wasn't much discovery. The defense came in pretty fast and filed a qualified immunity motion, and we had the hearing on that, and the case got tossed. Then you're entitled to discovery. Well, we did file a discovery request, but it's my recollection that the defense took the position that discovery should be limited because of the qualified immunity matter, and that came on before the judge, before there was that much discovery. And while I'm at it, I just have less than a minute, but I do want to say, if you reverse the district court, then the other claim should be reinstated. The defense takes issue with that on the issue of, should the municipal liability claim against the City of Federal Way be reinstated? And again, here as in the Munger case, the record wasn't sufficiently developed, but I can represent to you as an officer of the court that the City of Federal Way Police Department did ratify and approve of the shooting and sent us an official letter denying our claim for damages. You have to file an administrative claim under state law first, attesting that, in their view, the shooting was reasonable. So there is municipal liability based on ratification, and the red light just went on, so I'll stop. Thank you very much. Good morning, Your Honors. My name is Bob Christie. I'm the attorney for the City of Federal Way and for Officer Miguel Monaco, who's present in court with me today. About a business from Federal Way. I was not here on another matter on Wednesday, Your Honor, for a different city, City of Pacific. But? I was here for the City of Pacific on Wednesday, not for the City of Federal Way. I can represent all these cities. Try to represent as many as possible. Yes. All right. The record in this case, which is uncontroverted on these points, is that there were three shots fired at Mr. Martinez. Two shots fired virtually simultaneously, one being a 9mm and one being a shotgun blast. The 9mm shot entered his left wrist, exited his forearm, traced his clavicle, and entered the nape of his neck. That shot came, by physical facts, at a point in time when his left arm was extended directly at Officer Boutte, who fired the 9mm. But he was left-handed, huh? Your Honor, to answer Judge Thompson's question, I just re-read the record, and it is not crystal clear what hand his weapon was in at that point in time. I do see in the record that when he put the gun away the time before that and had it in his hand before he pulled it out the last time, that he did it with his right hand. So I do see that in the officer's reports. Anyway, my point is that there can be no question where his arm was pointed at the time that 9mm was fired. Yeah, but was the gun in the hand at the time? That's not clear in the record. That's not clear. Was the gun in one hand or the other? Yes. That's undisputed, is that the gun was in his hand. Whether or not it was his left hand or his right hand is not clear. Simultaneous with that was the shotgun blast, which struck his left… Correct. It was exactly here, entering here, exiting the forearm, tracing the clavicle and going through the nape of his neck. And the record is undisputed as to who has the 9mm and who has the shotgun?  It is undisputed. Was Boutte that had the 9mm and Monaco? That had the shotgun, that's correct. And the testimony, which also is undisputed, is that at the moment Officer Monaco saw the arm extended towards Officer Boutte, he perceived the threat having raised to the level of immediacy, immediate threat of lawful or deadly force, and that's when he fired. The testimony, again undisputed, is that those two shots were instantaneously, so quickly that it was not clear to Officer Boutte at all that there had been a second shot because of the report that he heard from his first shot. The medical testimony is uncontroverted that the fatal shot, and this is my supplemental excerpt of record page 8, the autopsy report, the fatal shot was the first shotgun blast to the trunk, the first shot of Officer Monaco, one of the pellets having severed the aorta and causing a bleed out, and that's what killed Mr. Martinez. So that is undisputed in the record to answer your question. I know that that's what the autopsy report said. There was nothing else in the record that would controvert that. That is correct. The autopsy report and the medical examiner who prepared the autopsy report was the only one to testify at the inquest hearing, and the evidence in the record for the most part is inquest hearing testimony that was presented under oath. He's also the one that described the arm position having to be extended in order to create the path of the wound by the 9 millimeter. I don't ever remember a case involving an officer shooting where a shotgun was used. Your Honor, the shotgun in this case had two types of ammunition in it, and it's fairly common that they're loaded with alternative shots. I believe some of this testimony is in the record. I'm not just making this up. It's Officer Boutte's testimony. The first shot has a large-sized pellet in it with approximately nine round balls in the shot. It's not a fine shot. The second shot, the alternative. A shotgun is like canister, huh? I would call it that, yes. The second shot is a slug, one piece, and that's the shot that hit him, grazed his right heel, and lodged in his buttocks. That was a slug because it was recovered from that part of his body during autopsy. The argument. How big is that slug? I'm going to kind of guess. This is a 12 gauge, so I'm guessing that the diameter of it is probably about 6, 7 millimeters. The testimony of my esteemed colleague focused almost principally on the first element of the Saussure test, which the district court never got passed. They found that there was no violation of a constitutional right given the facts viewed most favorably to the plaintiff. Is this a double-barrel shotgun? No. It's a pump-action shotgun. Pump-action shotgun. I can confirm that. I don't know that that's in the record, but my client is here. I believe it was a pump shotgun. Is the barrel rifled? The barrel is not rifled. The barrel is not rifled. The issue is whether or not there was a violation of a constitutional right, and the test for reasonableness under the Fourth Amendment is, of course, set forth in the Graham v. Connor and rearticulated in the Saussure case, and we know that that is judged from the perspective of an officer on the scene at the time facing circumstances that are tense, rapidly evolving, and uncertain. We do not view it. Is there evidence after Saussure that got to the second element of Saussure? You know, Your Honor, your decision in Meredith v. Erath in February of 2003 I don't believe got to the second element. I just don't think it's possible. Judge Justice Kennedy disagrees with that. He seems to think that in an excessive force case, you can first determine whether there was excessive force in violation of the Fourth Amendment, and then you could determine that even if that were so, a reasonable officer could think that he could use excessive force. My own personal opinion is that the articulation of the two-part test was much better stated before Saussure. I thought it was clear. Could you put that in writing, please? I'd be happy to, especially since the Ninth Circuit wrote the underlying opinion in Saussure. Yeah, I totally agree with the Court on that. At any rate, ultimately, the first question is whether or not there was a violation of a constitutional right. And viewed from the perspective of Graham v. Conner, without looking at whether or not a reasonably objective officer could believe that force, deadly force was justified, which is the second test, I believe you never get past the first test. Judge Peckman believed you never get past the first test. So if we look at this case factually, there are two key features that are uncontroverted, and I've highlighted both of them, one of them being the path of the bullet fired by the first officer that shot that recognized that at that instant moment in time, Mr. Martinez had reached a point with raising his hands that the threat of force, of deadly force, was now imminent. And coincidentally, the path of that bullet makes it unequivocal that his arm was pointed directly at Officer Boutte. I just thought of something. When you were saying you couldn't probably get, you know, we were talking about whether you could get to the second prong, assuming for the sake of argument right now that you get to the second prong, the fact that the uncontroverted evidence is that two officers made the same simultaneous, essentially within seconds. That was going to be the other key feature I was going to highlight. Would that be evidence of what a reasonable officer would think? Absolutely. It has to be, because this case is unique both in the trace of the bullet, which confirms where the arm was, irrespective of what may have been perceived by others, given that there's always a time lag between when the shot is fired and when the report is heard. That evidence of two officers perceiving at the exact precise moment in time when the threat of force, which had been evident for some period of time with Mr. Martinez waving his weapon around, making the statements that you indicated, there's going to be some shooting going on here. There was a precise moment when both of them perceived what had been a general threat of deadly force now become imminent. And they both fired instantaneously. So I believe that that is evidence of what an objectively reasonable officer could believe if you get to the second test. How far was the officer that fired the first shot from Mr. Martinez? The record indicates that both gentlemen were approximately 30 feet. Officer Boutte was slightly closer. It was Officer Monaco's belief that Officer Boutte, who had the 9mm, because he was the closest and because of the way he was situated next to his door, was the most exposed of all the officers present. Officer Monaco's testimony is in the record that he was approximately 30 feet, again, in the V of a door, I believe on the passenger side. If you hit someone with a handgun 30 feet, I mean, assuming he thinks there's a gun in his hand and he aims, either a lucky shot or you're just an excellent marksman. Either way, in this case, Your Honor, the one thing it does from the perspective of Officer Monaco, who is the only individual named defendant, is it removes any doubt by virtue of the way the bullet traveled, removes any doubt as to where Mr. Martinez had that left hand pointed at the instant that that shot was fired. But we don't know what was in that left hand. That is not clear to me in the record. It's clear to me... Well, if he was right-handed. I don't know that that's in the record either, Your Honor. I don't know that that's in the record. The record is not well-developed either on the point of his historic drinking. In other words, whether he was an alcoholic and could function well at the blood alcohol level that was found. What is in the record is that he was staggering, that he did appear to be confused, that he was irrational, which, as the officers testified, heightened their concern about what his actions might be at any second. That the difference between being here and here or being here and here in terms of firing are instantaneous. And back to Judge Callahan's point, there is no requirement under the law that you allow the suspect to shoot first. If we get to the second element, I believe the evidence that is undisputed about the shots being almost instantaneous does establish objective reasonableness. And, of course, the test for that is that all but the plainly incompetent are going to be protected. That if a reasonable officer could believe, again, under the lens of Graham versus Connor, that we're not looking at this from the perspective of 20-20 hindsight. We are looking at it from the perspective of an officer on the scene evaluating rapid, tense situations. That if an officer could believe that the use of deadly force was justified, then qualified immunity applies. And here two officers believe that at the exact same instant. Yeah, I mean, sure, that's evidence. Some officers believe that. But, you know, things happen so quickly. One officer fires a shot. Maybe he's mistaken as to what's in the person's hand. And the other one just reacts, you know. He's got his finger on the trigger. He hears the shot. He fires, you know. To the extent that the court looks at the subjective belief of the officers, what the testimony is on that subject by Officer Monaco is that at the moment that officer or that Mr. Martinez leveled his arm on Officer Boutte, he began, he sensed that this was the moment in time that I have to fire or Officer Monaco may be shot. And he also testified. Isn't the record that he thought that Boutte was shot? That's right. He did testify that he heard a report, literally, as he's in the process of firing his weapon, he heard the report of a weapon. His belief at the time was that he had waited a split second too late and that Mr. Martinez had just shot Officer Boutte. It turned out to be Officer Boutte having perceived the threat and fired his weapon a split second before Officer Monaco fired. Aren't these jury issues? They are not jury issues because we have the qualified immunity test. We have a two-part test that doesn't force every case that has a hindsight dispute over events that occurred in microseconds. We have to look at the totality of the facts, and we can view all those facts most favorably to plaintiff to the extent that they're not in dispute. The physical facts cannot be controverted, and we ask whether or not a reasonable officer There's nothing in this record to tell us whether Martinez was left-handed or right-handed. It's kind of important, isn't it? It may or may not be important. What is clear in the record, Your Honor? Let me ask you this. Okay. Anything in the record that while the police were at the scene, they ran a quick make on him? Like, who is this guy? I believe... We got nothing on him, or, you know, he'd been arrested 15 times and twice for armed assault. To be true to my memory of the record, Your Honor, I believe that because he was involved in a hit-and-run beforehand, they did get a license plate, ran it, and confirmed who the vehicle was registered to. I don't believe there's evidence in the record about them getting any more detail than the fact of his identity. Listen, I think it seems to be that there was evidence in the record that dispatch was advised that the driver was possibly drunk and had a handgun in his waistband. That is absolutely correct. Then dispatch reported a second caller had identified a black pickup as just having been involved in a hit-and-run accident, and that's what I see in the record. That's all true. I was trying to answer the judge's question about whether they got more from dispatch in terms of background information on him beyond what had been observed, and I don't believe there's any of that in the record. The next issue in the case, and every claim in this, I submit, falls from the determination that this officer acted objectively reasonable. The next set of claims that were dismissed by the trial court were the state law claims, and I believe, while it is de novo review, that Judge Peckman's analysis of that issue is a model for this Court in terms of addressing the components of the immunity under Washington state law, which, frankly, is quite close in its articulation to the test for qualified immunity originally articulated in Harlow v. Fitzgerald. Every time you say Peckman, I think of Judge Peckham, who was a wonderful person in San Jose who passed away. When I first heard it, I wondered, well, has he got someone in his family up here? But the spelling's different. Yeah. I'm referring to Judge Marsha Peckman, who's one of our district court judges. Oh, I know that. And I appreciate the honor of arguing before judges from a different part of the country. The analysis under that is whether or not the officer was carrying out a statutory duty, and, of course, it's not a duty to shoot someone, but there is statutory authorization under RCW 9A-16040 that authorizes the use of deadly force in exactly this situation. It was per procedure, and the ultimate issue under our qualified immunity, as it is under the federal immunity, is whether or not the officer's actions were reasonable. Are there in the federal city force? Do you mind if I inquire, because I have the police chief here as well? I don't know that it's in the record. We have 117 commission officers. 117 commission officers, Your Honor. It may have been a few officers less. This was in March of 1999, but roughly that number. The next issue that is in the case is whether or not there was a failure to provide medical care, and that's asserted both under federal and state law. We've articulated the different standards. The standard under federal law, of course, is the 14th Amendment due process deliberate indifference standard. The trial judge found, and I submit this Court should equally find, that there is no evidence of deliberate indifference. Now, another red herring issue that is submitted in the appeal is whether or not Officer Monaco had an obligation to warn Mr. Martinez that he would be shot if he didn't drop his weapon. Judge Peckman found, and I submit for this Court to also find, there's undisputed evidence that Officer Parker, another officer on the scene, made that exact precise statement to Mr. Martinez. She commented, and I think it makes common sense, that you should not impose an obligation on every officer on the scene to make that statement in the event that they may be the unfortunate officer who has to discharge his weapon and use deadly force. I would say the law doesn't require that when the shooting is imminent, that you have to say words before you, you know. I mean, I think the law clearly states that. I agree, Your Honor. I was just, I guess, more reacting to an argument that was made in the briefs rather than believing that that would at all be appropriate here. But the point is that in the record it is clear that that kind of statement was made. On the other argument that was made under State law is that there was a failure to provide medical care on a negligent basis. The standard under Washington is that if you create the emergency situation that results in the medical care, that the test is not whether or not you made the best choice, it's whether or not your choice was reasonable under the circumstances. We also have the Ninth Circuit law that makes it clear that there is no obligation for an officer to initiate CPR. And even more fundamental in this record, there's no evidence that CPR was appropriate in this case. The evidence in the record is that Mr. Martinez was breathing and was breathing labored. He died from having bled out. He did not die as a result of anything that CPR would have stopped. So there's also evidence that first aid was provided almost immediately and that the decision was to let the medical people that were on hand that had been called respond to that rather than the officers undertake that. If he was favorable to the appellant, how long was it from, I think, the shooting and then how long was it from the, I guess, when he was on the ground, the call until people, until medical personnel arrived? Medical had been staged, Your Honor, and it's my recollection of the record that by at least one lay witness' estimation, there was a period of five minutes. I think that's one lay witness' estimation of time. I see that my time has expired and I'm over time. What about, you know, wasn't there a call for a weapon that would fire pepper spray? What about that? Yes, there was, Your Honor. There was a call for a projectile jet is the name of the device, and there's testimony in the record that the call had been made, and there's a guess by the officer that it may have been there in a matter of minutes, and I can't recall the precise number of minutes. I submit that that is a complete red herring issue. It would really force an officer at the moment that a weapon is leveled on him to tell the individual, wait, stop, there will be a less lethal use of force here present shortly that I might be able to employ against you. That's a silly position, and I don't think it adds to the analysis here of whether or not the decision to use force when there was an imminent threat was objectively reasonable. Well, just playing the devil's advocate here, what would that, could that be, if that's an undisputed fact in the record that it was called for, could that be an argument that they were prepared to use lesser force, but it didn't get there on time? Actually, Your Honor, the balance of the testimony in the record on that point is that it would not have been appropriate to deploy at the point in time where he had the weapon in his hand and was able to use that weapon immediately. It would be used if he were away from the weapon and was still presenting a danger, but it would not be a use of force that they would employ, or a weapon they would employ when he had a handgun in his hand and looked like he was imminently prepared to use deadly force. They would not use that less lethal method because it may not have the intended effect. We, again, can't forget part of the totality of the circumstances is that this is all taking place in a crowded apartment complex in a parking lot with a daycare adjacent to it. That is part of the circumstances surrounding the setting in which Officer Monaco found himself. Unless there's other questions, I'll step aside. Thank you, Your Honor. There's nothing in the record concerning Mr. Martinez's past criminal history, if any such existed. That is correct from my recollection of the record. I believe the extent of that is information about what had happened that day, and that is that he was reported to be intoxicated, had been in a hit-and-run, had a weapon. And there's no question about the weapon. Thank you, Your Honor. Thank you. We'll give you a minute for, if you want, any rebuttal. Sure. Thank you, Your Honor. I agree. They had no information that he had a prior record or that he was, you know, violent convictions, anything like that. This was a traffic stop for two misdemeanor hit-and-run matters. Secondly, it was Officer Parker who called for the projectile jet that carries mace and could be fired 50 to 75 feet to disable a suspect. He testified that, or he estimated that it could have arrived within six to seven minutes, which would have been about the amount of time between when Mr. Martinez got out of his truck and when he was shot. I'd like to simply ask the court to let us try this case to a jury. If they don't agree with our position, fine, but it should not have been dismissed on summary judgment. Lastly, I'd like to thank the court for holding the oral argument today. I'm at the end of the third week of an aggravated murder trial, and it would have been really hard for me to come in yesterday. So I appreciate your coming in here today. I know the federal government in general is closed down, but I really appreciate your giving me a break on that. Thank you. All right. Well, we're here to serve. This matter was advance submitted.
judges: Pregerson, Thompson, Callahan